GARY B. TRAYSTMAN *v.* LISA M. TRAYSTMAN
(AC 34025)

DiPentima, C. J., and Beach and Bishop, Js.

Argued January 4—officially released April 9, 2013

*Adam A. Laben,* with whom, on the brief, was *Denise Ansell* for the appellant (defendant).

*Drzislav Coric,* for the appellee (plaintiff).

BEACH, J. In this marital dissolution action, the defendant, Lisa Mei Traystman, appeals from the judgment of the trial court with respect to (1) several of the court's financial orders, (2) its decision to hold her in contempt for violating the automatic stay provisions contained in Practice Book (2010) § 25-5, (3) its ruling on aspects of her discovery requests and (4) its denial of her motion for disqualification of the trial judge. We reverse the judgment, in part, and remand the matter for a new hearing as to all of the financial orders.

The record reveals the following relevant facts and procedural history. The plaintiff, Gary B. Traystman, and the defendant were married on December 5, 1984, in New London. On August 31, 2011, the court rendered judgment dissolving the parties' marriage and entered related financial orders. An issue in the dissolution trial before the court was the determination of the true extent of the plaintiff's earnings and assets, which the defendant alleged were significantly greater than represented by the plaintiff. The plaintiff is a member of the law firm Traystman & Coric, LLC (firm). The other members of the firm were the plaintiff's father, Harry Traystman, and Drzislav "Dado" Coric, who represented the plaintiff in this dissolution proceeding. The firm also employed one associate. Harry Traystman owned a 45 percent equity stake in the firm, the plaintiff owned 30 percent, and Coric owned 25 percent. Each member drew a salary of $1000 per week, and the firm's profits were shared in accordance with the members' respective ownership interests. The firm handled diverse matters; the plaintiff specialized in family law matters.

Determining the value of the firm proved challenging. The defendant enlisted John Villano, a certified public accountant, to analyze the plaintiff's personal cash flow

as well as to review the firm's financial records. Villano's efforts to place a value on the firm allegedly were complicated by the plaintiff's objection to the disclosure of certain financial documentation on the ground that it was protected by the attorney-client privilege. Ultimately, Villano testified that he was unable to form an opinion as to the value of the firm.

Villano did testify that, based upon his analysis of the firm's billing records, the plaintiff averaged forty billable hours per week and billed his clients $300 per hour. This testimony formed the basis of the court's attempt to calculate the plaintiff's earnings. The court accepted Villano's uncontroverted estimate that 35 percent of the plaintiff's fees were uncollectible.[1] There was no testimony regarding the firm's overhead expenses; thus, the court utilized two different methods for estimating this figure. The court first noted that, in its experience, small firms generally have overhead expenses constituting 50 to 60 percent of gross revenue. In this case, the court chose to apply an overhead expense rate of 60 percent because Harry Traystman drew a salary and shared in the firm's profits, but he did not generate significant revenue. The court then conducted a second calculation by averaging the firm's overhead expenses as a percentage of gross revenue, as reflected in the firm's 2008, 2009 and 2010 tax returns.[2] The average overhead expenses from these three years was 73 percent of gross revenue. Using these two figures for overhead expenses—60 and 73 percent—the court established a range—$95,659.20 to $131,040—for the plaintiff's estimated net contribution to the firm.

---

[1] The plaintiff testified that he had "no idea" what percentage of his fees were collected, as he did not keep records related to this issue.

[2] The court defined overhead as business deductions, excluding depreciation and the compensation of officers.

The court noted that the plaintiff's contribution to the firm's revenue was not reflected by his reported compensation; his amended 2010 tax return reported his adjusted gross income as $58,937. Accordingly, the court concluded that its financial orders were more appropriately based on earning capacity than on actual reported earnings. The court ultimately found that the plaintiff's earning capacity was $120,000 per year. The court found the defendant's earning capacity was $30,000 per year.

Using these figures, the court made the following findings and financial orders relevant to this appeal: the defendant was awarded $500 per week in periodic alimony;[3] the defendant incurred legal fees and related costs totaling $66,150, which the court found to be fair and reasonable; and the defendant was found to be in contempt for withdrawing approximately $60,000 from a home equity line of credit in violation of the automatic orders in effect at the time. See Practice Book (2010) § 25-5 (b).

Pursuant to Practice Book § 11-11, the defendant filed two postjudgment motions for articulation and reconsideration, which raised the following claims: the court had made significant computational errors in determining the plaintiff's earning capacity; the court had failed to distribute one of the parties' retirement accounts; and the court's finding that the defendant was in contempt was improper because the money she withdrew from the home equity line of credit was used for legal expenses incurred during the proceedings, which expenses the court found to be reasonable, and for basic living expenses.

---

[3] The court additionally ordered that the plaintiff pay the defendant's health insurance costs for three years, or until she obtained her own insurance coverage. The court stated that these costs should be considered additional alimony.

The plaintiff opposed the motions arguing that "[t]he [c]ourt's [financial orders] are clearly not based on any one calculation, nor on any one fact, rather they are the result of a multifaceted inquiry with carefully drawn conclusions therefrom." In light of this "multifaceted inquiry," the plaintiff argued that precisely how the court computed the plaintiff's earning capacity was inconsequential.

The court denied the defendant's motions. The court acknowledged the underlying computational errors, but stated that they did not undermine the reasonableness of its estimate of the plaintiff's earning capacity. It "[found] no reason to alter its decision relative to the alimony based on [this] regrettable, but simple typographical error." As to the retirement account that was unaccounted for in the financial orders, the court stated that this omission was deliberate because the plaintiff's retirement assets were "relatively minor" and because the plaintiff's alimony obligations had no term limitation. The court declined to reconsider its orders related to attorney's fees. This appeal followed. Additional facts will be set forth where necessary.

I

The defendant first claims that the court's determination of the plaintiff's earning capacity was undermined by computational errors, which resulted in an inequitable alimony award and amounted to an abuse of discretion. The plaintiff concedes that the court made arithmetic errors, but argues, as he did in opposing the defendant's postjudgment motions for reconsideration, that the court's alimony determination nevertheless was, on balance, reasonable. We agree with the defendant.

"A fundamental principle in dissolution actions is that a trial court may exercise broad discretion in awarding alimony and dividing property as long as it considers all

relevant statutory criteria." (Internal quotation marks omitted.) *de Repentigny* v. *de Repentigny*, 121 Conn. App. 451, 460, 995 A.2d 117 (2010); see General Statutes §§ 46b-81 and 46b-82. "Our standard of review for financial orders in a dissolution action is clear. The trial court has broad discretion in fashioning its financial orders, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the questions of whether the . . . court correctly applied the law and could reasonably have concluded as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *Casey* v. *Casey*, 82 Conn. App. 378, 383, 844 A.2d 250 (2004).

This deferential standard of review is not, however, without limits. There are "rare" cases in which the trial court's financial orders warrant reversal because they are, for example, "logically inconsistent"; see id., 379; or simply mistaken; see *Ehrenkranz* v. *Ehrenkranz*, 2 Conn. App. 416, 423–24, 479 A.2d 826 (1984). We cannot countenance financial orders that are the product of mistake, even if they ultimately may be seen to be reasonable. "A decision that accidentally falls within allowable limits of discretion because of a computation error by the court cannot be allowed to stand. To stretch the concept of limited appellate review in [such cases] in order to find no error because the amount awarded may have been fair, would require this court to usurp the fact finding function of the trial court." Id., 424.

The court's computations underlying its estimation of the plaintiff's earning capacity were flawed. The court found that the plaintiff generated approximately $624,000 in annual fees for his firm, and then purportedly applied a 35 percent discount for uncollected fees. Applying this discount, the court calculated that the firm would collect $218,400. As the defendant correctly

pointed out in her postjudgment motion, if 35 percent of the plaintiff's fees were not collected, he would realize $405,600 in fees. Continuing with the court's method of calculation, deducting 60 percent for overhead expenses results in $162,240 in net income to the firm. Applying overhead expenses of 73 percent, as the court did in its alternative calculation, the plaintiff's work would result in $109,512 of net income. These figures differ significantly from those arrived at by the court— $95,659.20 with 73 percent overhead, and $131,040 with 60 percent overhead, compared with correctly computed figures of $109,512 and $162,240, respectively. If the court's reasoning were consistent, the imputed earning capacity using the corrected figures would be approximately $146,000 rather than $120,000.

When this error was brought to the court's attention in the defendant's postjudgment motions, the court declined to alter its financial orders. Instead, it noted that the correct calculations, applying overhead expenses of 73 percent, resulted in a contribution to the firm of $109,512.[4] This figure, the court asserted, was "in line with" the earning capacity it had assigned to the plaintiff. With respect to the retirement assets that the court had neglected to allocate, the court attributed its decision not to divide them to the terms of the plaintiff's alimony obligations.[5]

The court's failure to reconsider its financial orders, after being apprised of these significant errors, was an abuse of discretion. Once it was clear that the basis for the orders was flawed, they could not be salvaged by the court's assertion that the errors were inconsequential. See *Ehrenkranz* v. *Ehrenkranz*, supra, 2 Conn.

---

[4] The court did not recalculate what the plaintiff's contribution to the firm would have been using the lower rate of overhead expenses (60 percent) that it had also utilized in its memorandum of decision.

[5] Apparently the plaintiff's retirement income could be useful in helping to fund alimony obligations.

App. 422–24 (reversal required when there was error in computation underlying financial award, even though trial court claimed that disputed computation was "only . . . a starting point" [internal quotation marks omitted]). The defendant was "entitled to overall financial orders which reflect the court's discretion and are based upon the facts elicited and the statutory criteria." Id., 424.

"[W]hen an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders." *Smith* v. *Smith*, 249 Conn. 265, 277, 752 A.2d 1023 (1999); see also *Sunbury* v. *Sunbury*, 210 Conn. 170, 174–75, 553 A.2d 612 (1989) (where trial court miscalculated plaintiff's earning potential by 46 percent, remand only for reconsideration of alimony award inadequate because, "[t]o limit the remand . . . would impede the trial court's ability to weigh the statutory criteria for financial orders to achieve an equitable result"). The rationale for requiring a reexamination of all of the aspects of the financial orders is their inherent interdependence. See *Smith* v. *Smith*, supra, 277. Indeed, this state's appellate courts "have often described financial orders appurtenant to dissolution proceedings as entirely interwoven and as a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) Id.

Therefore, on remand the court must reassess all of the financial orders, including its rejection of the defendant's request for attorney's fees. See General Statutes § 46b-62 ("the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82"); see also *Utz* v. *Utz*, 112 Conn. App. 631, 641–42, 963 A.2d 1049

(court's allocation of attorney's fees to defendant appropriate where spouses had disparate earning capacities and where requiring plaintiff to pay her own attorney's fees would have "undermine[d] the purposes" of other financial orders), cert. denied, 291 Conn. 908, 969 A.2d 173 (2009).

## II

We next address the defendant's claim that the court erred by holding her in contempt for violating the automatic stay provisions imposed in dissolution proceedings by withdrawing money from the parties' home equity line of credit for living expenses and legal fees incurred during the pendency of the proceedings.[6] See Practice Book (2010) §§ 25-5 (a) (1) and (2).[7] Specifically, the defendant argues that § 25-5 (a) (1) permits a party to dispose of marital assets for "reasonable attorney's fees in connection with [the dissolution] action," and that the court found the legal fees and costs incurred by the defendant to be "fair and reasonable given the litigation."[8] We agree with the defendant.

The following additional facts are relevant to the disposition of this claim. During the proceeding, the plaintiff twice filed motions for contempt, alleging that the defendant had borrowed approximately $60,000 against the parties' home equity line of credit in violation of the automatic orders. In its memorandum of decision, the court granted the motions, but granted no further relief.[9] The court made clear, however, that the

[6] During the pendency of the proceedings, there were no pendente lite alimony orders in effect. See General Statutes § 46b-83.

[7] The automatic stay provisions that were in effect at the time of the service of process of the complaint in the present dissolution proceeding were revised, effective January 1, 2012. We therefore refer to the stay provisions of Practice Book (2010) § 25-5.

[8] The plaintiff failed to address this issue in his brief.

[9] In his motions for contempt, the plaintiff had requested that the court order the defendant to pay the attorney's fees and costs of maintaining the contempt action.

contempt finding influenced its financial orders. The court noted that its decision to hold the parties responsible for their own attorney's fees was "reflective of the order regarding the defendant's contempt . . . ." The court also asserted that it was denying the defendant's request for attorney's fees on the ground that her legal expenses were offset by the amount of money she had withdrawn from the home equity line of credit. Thus, the defendant's claim is that, although there was no practical relief granted with respect to the contempt order, the order in some fashion influenced, to her detriment, the court's determination of whether she was entitled to attorney's fees.

"The abuse of discretion standard applies to a trial court's decision on a motion for contempt. . . . A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [party] were in contempt of a court order. . . . To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt." (Internal quotation marks omitted.) *Brody* v. *Brody*, 136 Conn. App. 773, 796, 51 A.3d 1121, cert. granted, 307 Conn. 910, 53 A.3d 998 (2012).

Practice Book (2010) § 25-5 (a) provides in relevant part: "The following automatic orders shall apply to both parties, with service of the automatic orders to be made with service of process of a complaint for dissolution of marriage . . . . (1) Neither party shall sell, transfer, encumber (except for the filing of a lis pendens), conceal, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, individually or jointly held by the parties, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action." Additionally, during the

pendency of a dissolution action, "[n]either party shall incur unreasonable debts . . . including, but not limited to, further borrowing against any credit line secured by the family residence . . . ." Practice Book (2010) § 25-5 (a) (2).

The defendant argues that, in the absence of pendente lite alimony orders, she needed to borrow against the home equity line of credit for living expenses and attorney's fees.[10] She further states that it was the parties' practice to use the equity line of credit to pay for household expenses. The court alluded to this practice in its memorandum of decision. Thus, the defendant contends, her borrowing was consistent with the parties' "usual course of business" with respect to the home equity line of credit and was not in violation of the automatic orders.

The defendant additionally argues that the court's contempt finding was improper because the automatic orders expressly approve the disposal of marital assets for reasonable legal expenses incurred during a dissolution proceeding. The court found that the defendant's request for attorney's fees, which totaled more than $66,500, was reasonable, but declined to award any portion of the request because she had purportedly violated the automatic orders.

The court's contempt order was an abuse of discretion. It was inconsistent for the court to hold the defendant in contempt for withdrawing funds from the home equity line of credit, when the amount withdrawn was less than her attorney's fees and the court determined the fees were reasonable. Moreover, in the absence of pendente lite alimony orders, and in light of the court's finding regarding the defendant's minimal income, it is

---

[10] The court noted that, according to the defendant's financial affidavit and her financial records, she was earning $165 a week from her business as a personal trainer.

not clear how she could have paid her own living and legal expenses independently. Under the circumstances, the court's granting of the motion for contempt, and then using the contempt in fashioning the financial orders, was an abuse of its discretion.

### III

The defendant's next claim is that the court did not order sufficiently comprehensive discovery related to the finances of the plaintiff's firm. Specifically, the defendant claims that the court ordered inadequate discovery regarding the firm's IOLTA account,[11] thus precluding an accurate appraisal of the finances of the plaintiff's firm. We disagree.

The following additional facts are relevant to the resolution of this claim. Valuing the plaintiff's firm was a contentious issue at trial. One issue of particular concern was the firm's use of its IOLTA account, which use the court characterized as "somewhat questionable." The account was used to pay salaries to temporary employees who were family members, to pay bonuses to staff, and as a "personal account for Harry Traystman." Harry Traystman testified, for example, that he had used the IOLTA account for "business ventures," which were unrelated to the firm's activities.

Shortly after the defendant retained new counsel on January 5, 2011, she filed two motions to compel discovery. The plaintiff complied with all aspects of the motions to compel, except for the requests related to the IOLTA accounts, to which he objected. The court

---

[11] Rules of Professional Conduct 1.15 (a) (5) provides in relevant part: " 'IOLTA account' means an interest- or dividend-bearing account, established by a lawyer of law firm for clients' funds at an eligible institution from which funds may be withdrawn upon request by the depositor without delay. An IOLTA account shall include only client or third person funds, except as permitted by subsection (h) (6) [of the Rules of Professional Conduct]."

heard arguments on these discovery issues on February 3, 2011. At the hearing, the parties agreed that the plaintiff would produce three years of bank statements related to the IOLTA accounts. On February 18, 2011, as additional questions surfaced regarding the accounts, the court ordered that copies of cancelled checks for the same period be produced for in camera review. The court additionally requested that the defendant provide the court with a list of issues that should guide its review of the checks. After this review, the court issued an order on March 30, 2011, which was clarified on April 1, 2011, that the checks were to be produced to the defendant. The court required that "[a]ppropriate measures to protect client confidentiality can and should be taken." Accordingly, any information identifying clients was redacted before the checks were produced. Checks that were payable to individuals or entities other than clients—for example, the firm's members, employees and lenders—were not altered.

"With respect to the appropriate standard of review [regarding the court's ruling on discovery], Practice Book § 13-14 (a) provides in relevant part that a trial court may, on motion [to compel production], make such order as the ends of justice require. Consequently, the granting or denial of a discovery request rests in the sound discretion of the court . . . and can be reversed only if such an order constitutes an abuse of that discretion. The ultimate issue in our review is, therefore, whether the trial court reasonably could have concluded as it did." (Internal quotation marks omitted.) *Shaw* v. *Freeman*, 134 Conn. App. 76, 88–89, 38 A.3d 1231 (2012).

The court did not abuse its discretion in allowing the redaction of certain information from the documentation produced from the IOLTA accounts. The plaintiff disclosed three years of bank statements from the firm's IOLTA accounts, along with the cancelled checks

related to those statements. Analysis of this information led to the amendment of the firm's and the plaintiff's tax returns. Moreover, the court allowed the defense witness, Villano, to testify regarding irregularities that he discovered in his review of the checks that were produced and the consequences of those irregularities on the firm's value and income. Therefore, we cannot say that the court abused its discretion.

## IV

The defendant finally claims that the court erred by denying her motion for disqualification of the trial judge, which was filed after the court issued its decision. See Practice Book § 1-23. Specifically, the defendant argues that the court erred by not recusing itself from deciding whether to award the defendant attorney's fees to prosecute an appeal.

The defendant did not argue in her postjudgment motion, nor does she argue on appeal, that all of the proceedings should be vacated; her bias claim relates only to the court's decision regarding her request for attorney's fees to prosecute an appeal. The defendant's bias claim fails because it is, in essence, a claim that the sum of the court's errors demonstrates bias. It is axiomatic, however, that an adverse or unfavorable ruling is not, in itself, evidence of judicial bias against a litigant. See *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 317, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). "Moreover, the fact that a trial court rules adversely to a litigant, even if some of these rulings were determined on appeal to have been erroneous, [still] does not demonstrate personal bias." (Internal quotation marks omitted.) Id. Although we reverse several rulings of the court, these rulings do not evince judicial bias against the defendant.[12]

---

[12] The defendant also claims that the court's perception of the tense relationship between the plaintiff and the defendant's attorney, Denise Ansell, somehow caused the court to disfavor the defendant. Nothing in the court's

The judgment is reversed as to the financial orders and the contempt order and the case is remanded for further proceedings as to all of the financial orders; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

acknowledgment of a strained relationship between the plaintiff and Ansell is evidence of judicial bias.