******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PAUL GREENAN *v.* SUZANNE GREENAN
(AC 34320)

Beach, Robinson and Sheldon, Js.*

*Argued December 9, 2013—officially released May 20, 2014*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Calmar, J. [motion to seal, judgment]; Emons, J. [motion to seal, motion for attorney's fees].)

*David V. DeRosa*, with whom were *Paul Greenan* and, on the brief, *Austin B. Johns*, for the appellant (plaintiff).

*Norman A. Roberts II*, for the appellee (defendant).

*Karen L. Dowd*, with whom, on the brief, was *Melissa J. Needle*, for the minor children.

*Opinion*

BEACH, J. In this marital dissolution action, the plaintiff, Paul Greenan, challenges certain orders entered by the trial court in the course of the proceedings dissolving his marriage to the defendant, Suzanne Greenan. The plaintiff claims that the court erred in (1) denying his motion to seal the trial court's memorandum of decision, (2) mentioning his erased arrest record in its decision and improperly drawing an adverse inference from his assertion of the fifth amendment privilege against self-incrimination, (3) declining to award him alimony, (4) finding him to be in contempt of the court's automatic orders pursuant to Practice Book § 25-5, (5) ordering the parties to pay the fees submitted by the attorney for the parties' two minor children and by the children's guardian ad litem, and (6) entering certain orders regarding his 529 college savings plan account. We affirm the judgment of the trial court.

I

The plaintiff first claims that the court erred in denying his request to issue a sealed memorandum of decision.[1] We disagree.

The following facts and procedural history are relevant to our resolution of this claim. In September, 2011, the plaintiff filed a motion to seal, among other things, any written decisions concerning any sensitive and/or personal information about the parties and their children. The court denied this motion. On November 30, 2011, the plaintiff filed a second motion to seal the memorandum of decision.[2] At a hearing on January 17, 2012, the court, *Calmar, J.*, stated that the "decision is something that can be generally handled with some sensitivity." The next day, on January 18, 2012, the court issued an unsealed memorandum of decision in which it rendered judgment dissolving the parties' marriage. The plaintiff filed this appeal on February 7, 2012. On August 30, 2012, the court filed a corrected memorandum of decision; the court noted that the corrected decision incorporated clarifications requested in the plaintiff's August 10, 2012 motion for articulation. The opinion did not further explain the court's reasons for denying the motion to seal.

During the pendency of this appeal, on September 26, 2012, the court, *Emons, J.*, heard argument on the plaintiff's November 30, 2011 motion to seal. The plaintiff's attorney requested that the entire memorandum of decision be sealed. The court denied the motion. In a January 14, 2013 articulation, the court, *Emons, J.*, explained that it denied the plaintiff's November 30, 2011 motion to seal because "the plaintiff offered and/or furnished no new reasons to alter Judge Calmar's two (or more) rulings and/or decisions that are presently on appeal. The motion was not properly before this court."

"We review a trial court's decision granting or deny-

ing a motion to seal to determine whether, in making the decision, the court abused its discretion. . . . Inherent . . . in the concept of judicial discretion is the idea of choice and a determination between competing considerations. . . . When reviewing a trial court's exercise of the legal discretion vested in it, our review is limited to whether the trial court correctly applied the law and reasonably could have concluded as it did." (Citations omitted; internal quotation marks omitted.) *Vargas* v. *Doe*, 96 Conn. App. 399, 408–409, 900 A.2d 525, cert. denied, 280 Conn. 923, 908 A.2d 546 (2006).

"The presumption of openness of court proceedings . . . is a fundamental principle of our judicial system. . . . This policy of openness is not to be abridged lightly. In fact, the legislature has provided for very few instances in which it has determined that, as a matter of course, certain privacy concerns outweigh the public's interest in open judicial proceedings." (Citation omitted; internal quotation marks omitted.) Id., 406. The legislature, however, statutorily permits closed hearings and sealing of records in "family relations matters"[3] where "the welfare of any children involved or the nature of the case so requires. . . ." General Statutes § 46b-11.[4]

The plaintiff argues that the "children's interest in avoiding stigmatization and permanent psychological harm from the highly charged information revealed in the [memorandum of decision] overrides any public interest." He argues that the personal family details included in the memorandum of decision require that it be sealed.

"[The public] policy of openness is not to be abridged lightly." (Internal quotation marks omitted.) *Vargas* v. *Doe*, supra, 96 Conn. App. 406; see also Practice Book § 25-59A (a) ("[e]xcept as otherwise provided by law, there shall be a presumption that documents filed with the court shall be available to the public"). We have carefully reviewed the materials in question and decline to hold that the court abused its discretion in implicitly finding that the privacy interests in the case did not outweigh the presumption of openness and, thus, the court did not improperly deny the motion to seal.

II

The plaintiff next claims that the court erred in (1) mentioning his erased arrest record in its memorandum of decision and (2) improperly drawing an adverse inference from his assertion of his rights and privileges under the fifth amendment. We disagree.

General Statutes § 54-142a (e) (3) provides that "[a]ny person who shall have been the subject of such an erasure shall be deemed to have never been arrested within the meaning of the general statutes with respect to the proceedings so erased and may so swear under oath." "[Section] 54-142a refers by its terms to records

of criminal proceedings, mandating in subsection (a) the erasure of all police and court records and records of any state's attorney pertaining to charges which have been dismissed, and prohibiting in subsection (e) the disclosure of the contents of those records by judicial or law enforcement personnel. There is no reference in the statute to disclosures by private parties or to matters extraneous to the records themselves. . . . [T]he [purpose of the] erasure statute . . . is to protect innocent persons from the harmful consequences of a criminal charge which is subsequently dismissed. . . . Prohibiting the subsequent use of records of [a] prior arrest [that has been erased under § 54-142a] and court proceedings adequately fulfills this purpose by insulating such an individual from the consequences of the prior prosecution. The statute does not and cannot insulate [an individual] from the consequences of his [or her] prior actions." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Morowitz*, 200 Conn. 440, 449–51, 512 A.2d 175 (1986).

A

In its January 18, 2012 memorandum of decision, the court mentioned that the plaintiff had been arrested on February 8, 2010, on drug related charges, that the resultant criminal case was resolved by way of a court-ordered diversionary program and that the plaintiff reported that these charges had been erased pursuant to § 54-142a (e) (3).

The plaintiff's claim requires us to review the applicability of a statutory provision to the present case and, thus, our review is plenary. See *Perry* v. *Perry*, 130 Conn. App. 720, 724, 24 A.3d 1269 (2011).

The plaintiff argues that the decision in the dissolution case was issued "in contravention of the erasure statute" and "created a new public record of the plaintiff's erased arrest after the plaintiff had successfully completed a diversionary program." Evidence was admitted at trial to support the court's findings regarding the plaintiff's arrest. The plaintiff has not established that this evidence was admitted in contravention of § 54-142a, or, in other words, that the evidence supporting the court's finding constituted "records" within the reach of § 54-142a. The erased records themselves were not admitted into evidence. The plaintiff testified on direct examination that he was arrested and that, as a result,[5] his visitation with his children became supervised and his employment was terminated. The plaintiff's testimony about his arrest was based on his recollection, independent of erased records and, thus, was not within the scope of § 54-142a. See, e.g., *State* v. *Morowitz*, supra, 200 Conn. 440 (§ 54-142a not bar to victim's testimony regarding memory of assault, which was based on personal knowledge independent of erased records); see also *Rado* v. *Board of Education*, 216 Conn. 541, 550–52, 583 A.2d 102 (1990) (§ 54-142a

did not bar testimony regarding observation of events where witnesses did not use any record subject to erasure in testifying).

The plaintiff's attorney introduced further evidence of his arrest. The plaintiff's attorney elicited testimony on direct examination from Dr. Eric Frazer, the court-appointed evaluator, regarding the plaintiff's arrest and drug related involvement in the context of their effect on supervised visitation and his reputation at his children's school. The plaintiff's attorney also entered into evidence Frazer's custody evaluation, which referred to statements the plaintiff made regarding his arrest. Furthermore, the plaintiff's attorney referenced the plaintiff's arrest during closing argument. The plaintiff cannot now complain that the court found facts in its opinion regarding his arrest, which facts are supported by his testimony and other evidence submitted by his attorney.

B

On direct examination, the plaintiff testified as to his arrest. On cross-examination, the plaintiff was asked, "[w]here were you on the evening of February 8, 2010,"[6] and was further questioned regarding the details of that night. The plaintiff invoked the fifth amendment in response to these questions. The defendant's attorney questioned the applicability of the fifth amendment due to the fact that the criminal case stemming from those charges had been disposed of and records relating to it erased. In its August 30, 2012 decision, the court noted that the plaintiff was cross-examined at trial regarding the events leading up to the arrest, and regarding drug use generally, and that he invoked his fifth amendment privilege. The court stated that it drew a negative inference from the plaintiff's refusal to testify concerning the February, 2010 incident.

Despite being able to testify lawfully that he had never been arrested; see General Statutes § 54-142a (e) (3); the plaintiff testified about his arrest on direct examination. On cross-examination, the defendant's attorney did not ask if the plaintiff had been arrested, but rather sought to elicit information regarding his actions on the night of the arrest. Although the erasure statute protects persons from the harmful consequences of criminal charges that are subsequently dismissed, it does not insulate an individual from the consequences of his or her prior actions. *State* v. *Morowitz*, supra, 200 Conn. 451.

The court did not err in drawing an adverse inference from the plaintiff's refusal to testify as to the events of February 8, 2010, because such adverse inferences are permitted in civil actions.[7] "The fifth amendment privilege against self-incrimination not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privi-

leges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. . . . The privilege does not, however, forbid the drawing of adverse inferences against parties to civil actions[8] when they refuse to testify in response to probative evidence offered against them. The prevailing rule is that the fifth amendment does not preclude the inference where the privilege is claimed by a party to a civil cause." (Citation omitted; emphasis omitted; footnote added; internal quotation marks omitted.) *Olin Corp.* v. *Castells*, 180 Conn. 49, 53, 428 A.2d 319 (1980). There also was other evidence from which the court could have concluded that the plaintiff had been involved in drug use.[9] It was not error for the court to draw an adverse inference about substance abuse from the plaintiff's refusal to testify on that subject and to rely on that adverse inference in crafting its orders.

### III

The plaintiff next claims that the court erred in declining to award him alimony. He argues that the court, *Calmar, J.*, abused its discretion in determining "without any explanation" that the plaintiff was not to receive alimony in light of the fact that Judge Shay had previously ordered an increase in a pendente lite alimony award to the plaintiff. We disagree.

In April, 2009, the court, *Shay, J.*, granted the plaintiff's motion for alimony and child support pendente lite, and ordered the defendant to pay the plaintiff unallocated alimony and child support in the amount of $1500 per month. In its April, 2011 decision on motions to modify filed by the parties, the court, *Shay, J.*, determined that there had been a substantial change in circumstances and ordered that the defendant pay the plaintiff $4000 per month in unallocated alimony and child support.

In its August 30, 2012 decision, the court did not award alimony to either party. The court found that the plaintiff intentionally and wilfully violated the automatic orders required under Practice Book § 25-5 by depleting assets that otherwise would have been available for distribution; the court stated that, rather than issue a specific order to restore the funds, it took the plaintiff's actions into consideration when fashioning its orders. The court noted that it "carefully considered" the statutory criteria in General Statutes § 46b-82[10] regarding the awarding of alimony and decided not to issue an award of periodic alimony to either party. The court stated that "[s]pecifically, but by no means exclusively, the court considered the causes of the breakdown, the plaintiff's pre- and postseparation behaviors and actions, the plaintiff's passive aggressive personality and confrontational approach, the custodial arrangements, the plaintiff's dissipation of the estate, and the

abilities and needs of the parties in fashioning the equitable distribution of the available resources."

In *Wolk* v. *Wolk*, 191 Conn. 328, 464 A.2d 780 (1983), our Supreme Court adjudicated a claim similar to the one presented in the present case. The court stated: "The claim that the court erroneously disturbed alimony pendente lite orders without a clear basis for doing so appears to misunderstand the difference between temporary orders prior to the dissolution of a marriage and final orders at the time of the dissolution of a marriage. The purpose of an award of alimony and support pendente lite is to provide [a party with support during the pendency of the dissolution action].[11] The final orders of alimony and support granted at the time of the dissolution necessarily address the long term conditions under which the reorganization of the family is to take place and include distribution of assets such as the family home and other significant assets. Since the purposes of pendente lite awards and final orders are different, there is no requirement that the court give any reason for changing the pendente lite orders." (Citation omitted; footnote added; internal quotation marks omitted.) Id., 330–31. The court did not err in declining expressly to discuss the reasons for changing the pendente lite orders.

The trial court has broad discretion in its award of alimony. See *McMellon* v. *McMellon*, 116 Conn. App. 393, 397, 976 A.2d 1 (so long as trial court considers all statutory criteria, it may exercise broad discretion in awarding alimony), cert. denied, 293 Conn. 926, 980 A.2d 911 (2009). The court specifically stated that it considered the statutory factors set forth in § 46b-82. After reviewing the record, we are not persuaded that the court abused its discretion in its award of alimony.

IV

The plaintiff next claims that the court erred in finding him to be in contempt of the court's automatic orders pursuant to Practice Book § 25-5. We disagree.

"The abuse of discretion standard applies to a trial court's decision on a motion for contempt. . . . A finding of contempt is a question of fact, and our standard of review is to determine whether the court abused its discretion in [finding] that the actions or inactions of the [party] were in contempt of a court order. . . . To constitute contempt, a party's conduct must be wilful. . . . Noncompliance alone will not support a judgment of contempt." (Internal quotation marks omitted.) *Traystman* v. *Traystman*, 141 Conn. App. 789, 799, 62 A.3d 1149 (2013).

Practice Book § 25-5 provides in relevant part: "The following automatic orders shall apply to both parties, with service of the automatic orders to be made with service of process of a complaint for dissolution of marriage . . . . (b) (1) Neither party shall sell, trans-

fer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action. . . . (5) Neither party shall incur unreasonable debts hereafter, including, but not limited to, further borrowing against any credit line secured by the family residence, further encumbrancing of any assets, or unreasonably using credit cards or cash advances against credit cards. . . ."

The court noted that the defendant claimed in her motion for contempt that the plaintiff, "without the knowledge or consent of the defendant, and in violation of the automatic orders: (1) drew on the credit lines secured by the [parties'] investment property [on Maryanne Lane] in Stamford and expended all of those funds in the approximate amount of $420,000; (2) borrowed approximately $400,000 from his mother since the commencement of the dissolution action; (3) expended approximately $80,000 to make improvements to the Maryanne Lane property, which improvements were not made in the usual course of business or for customary and usual household expenses; (4) expended over $400,000 to pay legal fees since the commencement of the action; and (5) withdrew over $50,000 from his retirement accounts and converted one of his retirement accounts from a traditional IRA account to a Roth IRA account, incurring a significant tax expense." The court stated that, in sum, the defendant alleged that "the plaintiff transformed his family estate, which had no debt and $1.5 million in equity in real estate, into an estate with $1.5 million in mortgage obligations and little equity."

The plaintiff argued before the trial court that "he did not violate the automatic orders because he drew down $420,000 on the property [on Maryanne Lane], borrowed $400,000 from his mother and withdrew over $50,000 from his retirement accounts to make $80,000 worth of necessary repairs to the property [on Maryanne Lane], pay necessary legal fees and cover his living expenses." The court rejected the plaintiff's argument. The court stated, "Although extra expenses were necessary to establish the plaintiff's separate housing and secure legal representation, the plaintiff, without the knowledge or consent of the defendant, mortgaged assets, took out loans and converted assets, all the while exercising little restraint over his spending and acting with a sense of entitlement. . . . The court finds the plaintiff intentionally and wilfully violated the automatic orders, and his unilateral expenditures depleted assets that would have otherwise been available for distribution. The court finds the plaintiff in wilful contempt of court. Rather than issue a specific order to restore the funds at this time, the court has taken the

plaintiff's self-help into consideration in fashioning its orders." (Citations omitted.)

The plaintiff argues that the court erred in finding him in contempt of the automatic orders because there was no evidence that he expended funds on anything other than legal fees, modest living expenses and emergency property repairs. We disagree.

The court found that, although some degree of extra expense was necessary to establish the plaintiff's separate housing and secure legal representation, the plaintiff, without the knowledge or consent of the defendant, mortgaged assets, took out loans and converted assets, exercising little or no restraint on his spending. Such spending reasonably could be found to be beyond the usual course of business or "for customary and usual household expenses" and assets were undisputedly encumbered. For example, the plaintiff himself testified that approximately $80,000 was spent for repairs to the Maryanne Lane property, including fixing the foundation, removing walls to fix the foundation, repairing electrical problems found as a result of removing the walls, and cutting the foundation in order to install larger windows downstairs. He further testified to taking out a $420,000 equity line of credit on the Maryanne Lane property; borrowing $400,000 from his family and expending over $400,000 in legal fees. The court reasonably could have determined that the plaintiff wilfully violated the automatic orders without the defendant's knowledge or permission of the court. The court did not abuse its discretion in concluding that the plaintiff violated the automatic orders.

V

The plaintiff next claims that the court erred in ordering the parties to pay the fees submitted by the attorney for the minor children and by the guardian ad litem. The plaintiff argues that the fees were unreasonable in light of counsels' level of diligence in representing the interests of the parties' minor children and the absence of an evidentiary hearing with respect to the reasonableness of their fees. We are not persuaded.

The court ordered that the parties each pay one-half of the outstanding fees and costs to the attorney for the minor children and to the guardian ad litem. The court determined that the attorney for the minor children was owed $74,131.68 as of November 30, 2011, and the guardian ad litem was owed $52,683.73 as of November 29, 2011. The court stated that it had reviewed the affidavits regarding fees submitted by the attorney for the minor children and by the guardian ad litem and found them "fair and reasonable under the circumstances of this difficult and lengthy case."

"The court may order either party to pay the fees for [a] guardian ad litem [and the attorney for the minor children] pursuant to General Statutes § 46b-62, and

how such expenses will be paid is within the court's discretion. . . . An abuse of discretion in granting [guardian ad litem] fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . .

"The statutory authority for the award of fees for a court-appointed guardian ad litem is found in § 46b-62. . . . Section 46b-62 provides in relevant part: If, in any proceeding under this chapter . . . the court appoints an attorney for a minor child, the court may order the father, mother or an intervening party, individually or in any combination, to pay the reasonable fees of the attorney. . . . The order for payment of [guardian ad litem] fees under General Statutes § 46b-62 requires consideration of the financial resources of both parties and the criteria set forth in General Statutes § 46b-82. . . . Section 46b-82 instructs the court to consider, inter alia, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties . . . . Although the trial court is not required to find expressly on each of the § 46b-82 factors, it must have sufficient evidence to support each factor." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Lamacchia* v. *Chilinsky*, 79 Conn. App. 372, 374–76, 830 A.2d 329 (2003), cert. denied, 271 Conn. 942, 861 A.2d 514 (2004).[12]

"[Trial] courts have a general knowledge of what would be reasonable compensation for services which are fairly stated and described. . . . Because of this general knowledge, [t]he court [is] in a position to evaluate the complexity of the issues presented and the skill with which counsel had dealt with these issues. . . . While the decision as to the liability for payment of such fees can be made in the absence of any evidence of the cost of the work performed . . . the dollar amount of such an award must be determined to be reasonable after an appropriate evidentiary showing." (Citations omitted; internal quotation marks omitted.) *Rubenstein* v. *Rubenstein*, 107 Conn. App. 488, 503, 945 A.2d 1043, cert. denied, 289 Conn. 948, 960 A.2d 1037 (2008).

We are constrained by our standard of review, which dictates that a court has broad discretion in such matters and that, in the absence of an abuse of discretion, we defer to the judgment of the trial court, which is in a better position than we are to assess the entire scenario. In this case, the guardian ad litem and attorney for the minor children presented evidence from which the court could have determined the amount of the fees and the reasonableness of the fees. See *Hartford*

*Electric Light Co.* v. *Tucker*, 183 Conn. 85, 91–92, 438 A.2d 828 (procedural due process requirements satisfied when party opposing reasonableness of attorney's fees is afforded opportunity to present evidence and cross-examine opposing parties' witnesses on question of reasonableness), cert. denied, 454 U.S. 837, 102 S. Ct. 143, 70 L. Ed. 2d 118 (1981).[13] Attorney Eric J. Broder, the guardian ad litem for the parties' children, testified as to the complexity of the case, the services he rendered and the resulting amount of his outstanding bill. He testified that in the approximately two years between the time of his appointment as guardian ad litem and the time of trial, he had interacted with the children and had met with the plaintiff "many" times. He noted the ways in which he kept up with the progress of the case and explained that he did not have extensive meetings with the children because "they don't want to see me." He testified that he had attended almost every court proceeding. His affidavit regarding fees was entered into evidence as a full exhibit. He testified that he billed at $500 per hour and that his total charges had amounted to approximately $142,575 through the previous day of trial, October 27, 2011. On November 3, 2011, he testified that he had provided an affidavit of fees and that the updated balance still outstanding was "just under" $53,000. He further testified that, as the proceedings progressed, "an overwhelming majority" of his time was spent on issues related to the plaintiff.

Melissa J. Needle, the attorney who represented the minor children during the eleven day trial, also submitted an affidavit regarding her fees.[14] On the first day of trial, much of the plaintiff's testimony was related to his motion to remove Needle as the attorney for the minor children. In her closing argument to the court, Needle noted that "this has been a very difficult case. It's been going for almost three years . . . ." She detailed her involvement in the case, including meetings with counsel, reviewing Frazer's reports, reviewing e-mails between the parties' attorneys, dealing with correspondence, pleadings, court transcripts, financial affidavits, attendance at "numerous" pendente lite hearings, and spending some time with the minor children.

The plaintiff has not specifically attacked any individual item included in the lists of hours and rates submitted by Needle and Broder in their affidavits. Rather, his claim centers on their level of diligence and their conduct during the case. On the first day of trial, the court denied the plaintiff's motion to remove Needle as the attorney for the minor children. As noted, Broder and Needle both provided affidavits regarding fees and both described to the court, either in testimony or in closing argument, their involvement in the case. The court determined that the fees submitted by the guardian ad litem and the attorney for the minor children were reasonable. In light of the length and complexity

of the trial, the protracted and adversarial nature of the proceedings on the whole, and the testimony of Broder and Needle as to the work performed, we are not persuaded that the court abused its discretion in its findings.

VI

The plaintiff last claims that the court erred in its orders regarding his 529 college savings plan accounts. We disagree.

The following additional facts are relevant to this claim. The court ordered that the minor children's 529 accounts[15] shall continue to be maintained for the benefit of the minor children and that the defendant shall be the custodian of those accounts.

The plaintiff argues that the court's orders regarding the 529 accounts violated General Statutes § 46b-56c (f) because the amount in the 529 accounts far exceeds tuition at the University of Connecticut for both children.[16] He argues that the court improperly disguised the assignment of his property (the 529 accounts) as an educational order. He further argues that the court, in fashioning this order, failed to take into account the first factor of § 46b-56c (c),[17] the parents' income.

Although 529 accounts pertain to education expenses; see 26 U.S.C. § 529; the court's orders regarding the plaintiff's 529 accounts were not educational support orders pursuant to § 46b-56c. Section 46b-56c (a) defines the "educational support order" to be "an order entered by a court requiring a parent to provide support for a child or children to attend for up to a total of four full academic years an institution of higher education or a private occupational school for the purpose of attaining a bachelor's or other undergraduate degree, or other appropriate vocational instruction . . . ." The court's orders with respect to the 529 accounts did not require the plaintiff to provide support in the future for the children to attend college. Rather, the court ordered that the plaintiff *continue* to maintain the accounts, which he had previously established and in which he had elected to place more than $280,000. The court further ordered that the defendant, to whom the court had granted sole custody of the minor children, be the custodian of the 529 accounts. The court ordered, pursuant to § 46b-56c, that the *defendant*, not the plaintiff, "be responsible for the educational expenses of the minor children . . . ." The accounts, per the court's order and 26 U.S.C. § 529[18] were for the benefit of the minor children. The court's order simply changed the person who was the custodian of the accounts, which were previously existing property, from the plaintiff to the defendant.

The 529 accounts were marital property pursuant to General Statutes § 46b-81, under the broad definition given to that term by our legislature.[19] "Rather than

narrow the plain meaning of the term property from its ordinarily comprehensive scope, in enacting § 46b-81, the legislature acted to expand the range of resources subject to the trial court's power of division, and did not intend that property should be given a narrow construction. . . . [O]ur broad definition of property was not entirely without limitation, and . . . property under § 46b-81 includes only interests that are presently existing, as opposed to mere expectancies." (Citations omitted; internal quotation marks omitted.) *Lopiano* v. *Lopiano*, 247 Conn. 356, 364–66, 752 A.2d 1000 (1998). The accounts were existing property, though payments were contemplated to be made from the accounts in the future.

The court did not err in its distribution of the 529 accounts. It is afforded broad discretion in its award of property. See, e.g., id., 374–75 (trial court afforded broad discretion when distributing marital property as long as it takes into account statutory factors in § 46b-81). "Generally, we will not overturn a trial court's division of marital property unless it misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard. . . . We must, however, consider, the paramount purpose of a property division pursuant to a dissolution proceeding [which] is to unscramble existing marital property in order to give each spouse his or her equitable share at the time of dissolution." (Citation omitted; internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 355, 880 A.2d 872 (2005).

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant argues that this issue is moot because the decision has been available to the public since the issuance of the initial decision in January, 2012. "Mootness implicates [the] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . Because mootness implicates subject matter jurisdiction, it presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *Wells Fargo Bank, NA* v. *Cornelius*, 131 Conn. App. 216, 219–20, 26 A.3d 700, cert. denied, 302 Conn. 946, 30 A.3d 1 (2011). On the record before us, it has not been shown that absolutely no practical relief can be granted.

[2] The court, *Calmar, J.*, did not directly and expressly deny the motion to seal, but did issue the decision without having ordered it to be sealed.

[3] General Statutes § 46b-1 (1) includes dissolution of marriage within the ambit of family relations matters.

[4] General Statutes § 46b-11 provides: "Any case which is a family relations matter may be heard in chambers or, if a jury case, in a courtroom from which the public and press have been excluded, if the judge hearing the case determines that the welfare of any children involved or the nature of the case so requires. The records and other papers in any family relations

matter may be ordered by the court to be kept confidential and not to be open to inspection except upon order of the court or judge thereof for cause shown."

[5] During some of the plaintiff's direct examination, the arrest was referred to as a February, 2010 "incident." Later in direct examination, the plaintiff used the word "arrest."

[6] The arrest occurred on February 8, 2010.

[7] The plaintiff's claim involves a question of law, over which our review is plenary. See *Rhode* v. *Milla*, 287 Conn. 731, 737, 949 A.2d 1227 (2008) (whether invocation of fifth amendment privilege constitutes admissible evidence is question of law over which our review is plenary).

[8] There are statutory exceptions to this rule that are not implicated in this case. See, e.g., General Statutes § 46b-138a; General Statutes § 52-146k (f).

[9] For example, Frazer testified that the plaintiff had reported to him that he refused to take a hair follicle test because "it would compromise his criminal case. So, my interpretation of that is that it would only compromise his criminal case if the test result would have been positive. . . . So, that would have been relevant to form my opinion about the presence or absence of substance abusing behavior."

[10] General Statutes § 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, education, employability [and the] estate and needs of each of the parties . . . ."

[11] See, e.g., *Gong* v. *Huang*, 129 Conn. App. 141, 151 n.16, 21 A.3d 474, cert. denied, 302 Conn. 907, 23 A.3d 1247 (2011).

[12] The appointment of a guardian ad litem, specifically authorized by General Statutes § 45a-132 (a), is governed by the same standards as those pertaining to an attorney for minor children, and the standards regarding payment of fees are the same for both categories. *Lamacchia* v. *Chilinsky*, supra, 79 Conn. App. 373 n.1, 374–76.

[13] The plaintiff was afforded such opportunities. His argument to the effect that a separate and distinct hearing was necessary has no merit.

[14] The plaintiff argues that the court improperly approved of the reasonableness of the fees of the attorney for the minor children given her "behavior in this case . . . ." He argues that the attorney for the minor children had solicited a bribe from him in exchange for the guardian ad litem's recommendation of joint custody. The court declined to grant the plaintiff's motion to remove the counsel for the minor children on the basis of this testimony, reasoning, in part, that the plaintiff did not have standing to make claims against the attorney for the minor children. His argument before us regarding inappropriate behavior does not pertain directly to the reasonableness of the fees, but rather is an attack on the continued appointment of the guardian ad litem. See, e.g., *Carrubba* v. *Moskowitz*, 81 Conn. App. 382, 405–406, 840 A.2d 557 (2004) (parent lacks standing to make claims against court-appointed attorney who represented interests of minor children during divorce proceedings), aff'd, 274 Conn. 533, 877 A.2d 773 (2005). Although a parent may lack standing to assert rights regarding competent representation, because the parent is not the client and the attorney has duties both to the court and to the child, the parent of course may point to ineffectiveness or other shortcomings in arguing over fees. In this case, the court clearly found the plaintiff's position unpersuasive, and we do not find the court's findings to have been clearly erroneous.

[15] Funds in a 529 account receive favorable tax treatment and are available for qualified education expenses only. See 26 U.S.C. § 529. The plaintiff's February 16, 2011 financial affidavit indicates that the total amount in the 529 account exceeded $280,000.

[16] General Statutes § 46b-56c (f) provides: "The educational support order may include support for any necessary educational expense, including room, board, dues, tuition, fees, registration and application costs, but such expenses shall not be more than the amount charged by The University of Connecticut for a full-time in-state student at the time the child for whom educational support is being ordered matriculates, except this limit may be exceeded by agreement of the parents. An educational support order may also include the cost of books and medical insurance for such child."

[17] General Statutes § 46b-56c (c) provides: "The court may not enter an educational support order pursuant to this section unless the court finds as a matter of fact that it is more likely than not that the parents would

have provided support to the child for higher education or private occupational school if the family were intact. After making such finding, the court, in determining whether to enter an educational support order, shall consider all relevant circumstances, including: (1) The parents' income, assets and other obligations, including obligations to other dependents; (2) the child's need for support to attend an institution of higher education or private occupational school considering the child's assets and the child's ability to earn income; (3) the availability of financial aid from other sources, including grants and loans; (4) the reasonableness of the higher education to be funded considering the child's academic record and the financial resources available; (5) the child's preparation for, aptitude for and commitment to higher education; and (6) evidence, if any, of the institution of higher education or private occupational school the child would attend."

[18] See footnote 15.

[19] "There are three stages of analysis regarding the equitable distribution of each resource: first, whether the resource is property within § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution)." (Internal quotation marks omitted.) *Lopiano* v. *Lopiano*, 247 Conn. 356, 364–66, 752 A.2d 1000 (1998).

———————————